

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THEODORE F. GRADEL,<br>SARAH GRADEL,<br>THOMAS A. MAZZA,<br>JAMES X. MAUDE,<br><br>    Plaintiffs,<br><br>v.<br><br>PIRANHA CAPITAL, L.P.,<br>LONGBOAT GLOBAL FUNDS<br>MANAGEMENT, LLC,<br>LONGBOAT GLOBAL ADVISORS, LLC and<br>ROBERT JOSEPH BEASLEY,<br><br>    Defendants. | No. 05 C 78<br>Wayne R. Andersen<br>District Judge |

## MEMORANDUM, OPINION, AND ORDER

This matter is before the court on Plaintiffs' motion for summary judgment on their breach of contract claim against Defendant Piranha Capital, L.P. For the reasons discussed below, the Plaintiffs' motion is granted.

### STATEMENT OF FACTS

The following facts are taken from the parties' briefs and statements of uncontested material facts. The Plaintiffs and Defendants object to various facts asserted by the opposing parties; however, the material facts needed to decide this motion are not in dispute. The Plaintiffs, Theodore and Sarah Gradel, Thomas Mazza, and James Maude are private investors. Defendant Piranha Capital, L.P. ("Piranha" or "the Fund") is a limited partnership organized under the laws of the state of Delaware with its principal place of business located in Florida. Piranha conducts business as a capital hedge fund that invests in financial instruments.

Defendant Longboat Global Advisors, LLC was the General Partner of Piranha until early 2002. In January 2002 Defendant Longboat Global Funds Management, LLC (both LLCs collectively referred to as "Longboat") became the General Partner of Piranha. At all times, Defendant Robert Joseph Beasley ("Beasley") was the sole managing member of Longboat.

In April or May of 2002, the Gradels, Mazza and Maude each invested $250,000 in the Piranha hedge fund. On April 25, 2002, the Plaintiffs signed the Piranha Capital, L.P. Subscription Agreement and henceforth were Limited Partners, their relationship with the partnership governed by the Subscription Agreement, the Private Placement Memorandum, and the "Agreement of Limited Partnership of Piranha Capital, L.P" ("LPA"). Plaintiffs Mazza and Maude each invested an additional $250,000 in their capital funds in June 2003. At this point, the combined investment of the Plaintiffs, less accrued profits, was $1,250,000.

The Plaintiffs received copies of Piranha's certified 2003 annual report in April 2004. Note 5 of the 2003 annual report represented that the Fund made investments in promissory notes, which were secured by "various properties both in the U.S. and overseas and by the assets of the borrower."

In May 2004, the National Futures Association ("NFA"), with which Longboat is registered as a commodity pool operator, began auditing Longboat. During its investigation the NFA raised concerns about real estate linked promissory notes held by Piranha that comprised over half of the Fund's assets. Pursuant to a request made by the NFA, Longboat sent a letter on July 2, 2004 to all of the Fund's investors to provide an updated status of Piranha's investment in real estate promissory notes. The letter stated that Piranha's promissory note investments were

2

relatively illiquid, some of the promissory notes held by Piranha were issued by companies controlled by Beasley, and only some of the promissory notes held by Piranha were secured.

On July 7, 2004, Piranha received written requests from each of the Plaintiffs seeking to redeem the entirety of their capital accounts. Withdrawals and distributions from the Piranha fund are governed by Article 6 of the LPA. Section 6.1(a) of the LPA states:

> "Except as provided in §§6.2 and 6.3, a Partner may withdraw, as of the end of any month, all or any portion of its Capital Account by giving 45 business days prior written notice . . . The General Partner may permit withdrawals as of dates other than month-end, and on less than 45 business days notice."

Section 6.1(b) governs the timing and amount paid to a withdrawing partner and states:

> "A Withdrawing Partner shall be entitled to receive an amount equal to the lesser of the amount set forth in his Withdrawal Notice of his Closing Capital Account for the Accounting Period in which the withdrawal is effective. Except to the extent provided elsewhere herein, the Fund shall to the extent practicable distribute not less than 95% of the estimated amount withdrawn pursuant to this §6.1 within 10 days after the effective date of withdrawal. Final settlement of the full amount of the distribution shall be made as promptly as the General Partner determines is feasible"

Section 6.3, which provides the General Partner with the right to suspend withdrawal, states:

> "The General Partner may, at any time, suspend the right of withdrawal, or postpone the payment of withdrawal proceeds, if and to the extent the withdrawal or payment would have a materially adverse effect on the Fund or the non-withdrawing Partners."

On September 10, 2004, each Plaintiff received a letter from Longboat signed by Beasley and an attached financial statement purporting to be an Individual Account Statement for the period ending on August 31, 2004. The letter signed by Beasley reflected that Piranha honored and distributed $2,769,724.98 to its Limited Partners. The accompanying financial statements

3

sent to the Plaintiffs indicated that as of August 31, 2004 each Plaintiff had a capital account balance of $0 and the entire balance accrued prior to that point was subtracted and documented in a row on the financial statement titled "Redemptions."

On September 20, 2004, the NFA gave notice of a Member Responsibility Action against Longboat and an Associate Responsibility Action against Beasley arising from the NFA's concerns regarding the real estate linked promissory notes held by Piranha. The NFA's action restricted Longboat from soliciting or accepting new capital and from disbursing money other than for meeting redemption demands or making any loans or investments without prior NFA approval.

On September 24, 2004, Longboat sent a letter to Piranha investors notifying them of its election to suspend withdrawal rights pursuant to §6.3 of the LPA. At this time, the Plaintiffs had not received any funds from their requested withdrawal. The stated reason for suspension was that Longboat believed "a substantial number of investors in the Fund will redeem, which redemptions likely would exceed the liquid assets of the Fund."

In October 2004, Longboat sent a "corrected August 31, 2004 financial statement" to each Plaintiff. The corrected statement returned the amount listed as "Redemption" in the original account statement to the account balance figure. The corrected amount of redemption in each Plaintiff's account statement was $0. The Plaintiffs did receive pro rata distributions of some of the Fund's liquid assets in October 2004 and January and March 2005 totaling $522,209.93. Plaintiffs have not yet received $903,631.59 of their initial investment and subsequent fund appreciation.

The Plaintiffs filed a complaint in the Circuit Court of Cook County on October 15, 2004 alleging among other things that the Defendants breached the LPA by refusing to distribute the funds held in Plaintiffs' capital accounts and committed securities fraud. On January 6, 2005, the Defendants removed the case to the United States District Court for the Northern District of Illinois pursuant to 28 USC §§ 1331, 1441 and 1446, the securities fraud count being a claim of original federal court jurisdiction.

## DISCUSSION

For the reasons discussed below, the Plaintiffs' motion for summary judgment on Count I of their Complaint is granted. Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Celotex v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The court considers the evidence in a light most favorable to the non-moving party and draws all reasonable inferences in its favor. *See Anderson*, 477 U.S. at 255.

Contract interpretation is a subject particularly suited for disposition by summary judgment. *Metalex Corp. v. Uniden Corp.*, 863 F.2d 1331, 1333 (7th Cir. 1988). If a contract is unambiguous and contains no uncertain terms, interpretation of the contract is a question of law for the court. *Dribeck Importers, Inc. v. G. Heileman Brewing Co., Inc.*, 883 F.2d 569, 573 (7th

Cir. 1989). Here, we will apply Delaware state law, which is designated as the body of law to govern the Agreement under §13.4 of the LPA.

## 1. Breach of Contract

Plaintiffs move for summary judgment on Count I of their Complaint, which alleges that Piranha ("Defendant") breached the LPA by failing to distribute the funds held in the Plaintiffs' capital accounts. Delaware law provides that contracts are to be construed as a whole, to give effect to the intentions of the parties. *Northwestern Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (1995). Only when a contract is ambiguous can courts consider extrinsic evidence to interpret the agreement. *Id.* A contract is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations." *Id.* Delaware law further dictates that the partnership agreement effectively constitutes the entire agreement among partners. *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999). We find that the Agreement in question is unambiguous and the court's consideration of whether the LPA was breached is largely limited within the corners of the Agreement.

*A. Limited Partnership as a proper defendant*

Defendant responds first by arguing that Piranha is not itself liable for breach of contract and that Longboat, as the General Partner, is the proper subject of Plaintiffs' motion. To support its argument, Piranha points to the fact that the limited partnership was not a signatory to the LPA and as a matter of contract law principle, only a signatory to a contract can be held liable for the breach of that contract. *See Wallace v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999). However, Delaware state statute provides a definition of the function of a limited partnership that defeats Defendant's argument. In defining the limited partnership, Delaware statute states, "[a]

6

limited partnership is bound by its partnership agreement whether or not the limited partnership executes the partnership agreement." 6 Del. C. §17-101(12) (2005). Under a plain reading of the statute, Piranha is a proper defendant to Plaintiff's motion.

*B. Early withdrawal*

Defendant's second argument to deny summary judgment is that its failure to distribute the Plaintiffs' capital funds did not breach the LPA. Section 6.1 of the LPA, the relevant portion set out in full above, states that a limited partner may withdraw from the partnership by providing 45 business days written notice. The final day of the month in which the 45 business days elapse marks the effective date of withdrawal. At least 95% of the limited partner's withdrawal is to be distributed to the limited partner within ten days of the effective date of withdrawal. The remaining 5%, if not paid within 10 days of the effective date of withdrawal, is to be paid as promptly as is feasible. The General Partner has the sole discretion to permit early withdrawal on less than 45 business days or on dates other than month-ends. The LPA does not denote any conditions that must be satisfied to grant early withdrawal.

The Plaintiffs gave written notice of withdrawal to Longboat on July 7, 2004. On September 10, 2004, each Plaintiff received a letter from Longboat signed by Joseph Beasley attached to a monthly financial statement. The letter stated, "[e]nclosed you will find your August 31, 2004 financial statement for the Piranha Capital, LP. Our accounting firm, Abaco Financial Services Corporation, Boynton Beach, FL compiles our financial statements." The bottom of the letter contained a "Statement of Changes in Net Asset Value" chart. The chart displayed that $2,769,724.98 was redeemed from the Fund. The attached financial statement gave an individualized breakdown of the changes in each Limited Partner's account as of August

31, 2004. The bottom section of the financial statement is marked "Statement of changes in net asset value." One of the final rows in this subsection is marked "Ending Net Asset Value." The value of that row in each Plaintiff's statement is (0.00). Above the "Ending Net Asset Value" row is a row titled "Redemptions." Each Plaintiff's "Redemptions" row shows the full amount of the Plaintiff's account in parenthesis, signaling that the amount was subtracted from the account at some time prior to August 31, 2004.

Defendant argues that the financial statements were sent in error by its accountant and do not represent the intention of the General Partner, who is the only party that can grant early withdrawal. Defendant states that there is no evidence that the General Partner waived the contractual 45 business day notice period. If early withdrawal was not granted, the 45 day period would have elapsed on September 9, 2004, making the effective date of withdrawal September 30 and the Plaintiffs would have been due to be paid on October 10, 2004.

The early withdrawal portion of §6.1 of the LPA, drafted by Defendant, contains no conditions to early withdrawal. The only description provided is that the General Partner has sole discretion to permit early withdrawal. "Permit," not defined in the LPA, has three definitions in Webster's Dictionary: (1) to consent to expressly or formally; (2) to give leave: authorize; and (3) to make possible: allow. *Miriam-Webster's Collegiate Dictionary, Eleventh Edition* (2003). Under each definition, Piranha permitted the Plaintiffs' early withdrawal. The letters and individual account statements expressly consented to and further confirmed early withdrawal, gave leave to take early withdrawal, and made early withdrawal possible.

The court's reference to the dictionary in this case is certainly not outcome determinative. The definition is neither extrinsic nor intrinsic evidence. Instead it is used to explain the full and

8

common meaning of the word "permit" and to supplement judicial notice. *See Nix v. Helden*, 149 U.S. 304, 307, 37 L. Ed. 745, 13 S. Ct. 881 (1893) ("Dictionaries are not of themselves evidence, but they may be referred to as aids to the memory and understanding of the court.")

Returning to the instant matter, Piranha's argument that it never waived the 45 business day notice period is unavailing. Formal waiver was not a necessary predicate to early withdrawal. Piranha needed only to permit early withdrawal, which it did and confirmed doing in its September 10, 2004 correspondence. The financial statement, sent to the Plaintiffs by Longboat, was attached to a signed letter. Together, the letter and financial statement expressly showed that early withdrawal had been permitted and that all of the Plaintiffs' money was withdrawn from the Fund. If "permit" as it is used in §6.1 is construed to be ambiguous, in which case extrinsic evidence may be considered, the timing of the letters and account statements are telling. The letters and account statements arrived on the day payment was to be due, which would lead a recipient who was familiar with the LPA to believe that the correspondence served as confirmation of accelerated withdrawal.

The fact that the individual account statements were compiled by Defendant's accountant does little to support Defendant's argument that the statements do not constitute permission for early withdrawal. It was Longboat through Joseph Beasley that signed an attached letter and actually sent the individual account statements to each of the Plaintiffs. The letter, the signature, and the account statement, sent to the Plaintiffs together, suggest that the correspondence was created at the behest of Longboat. Because the LPA requires no affirmative act by Longboat to grant accelerated withdrawal, other than permitting the early withdrawal, these representations made to the Plaintiffs are sufficient.

9

Piranha next argues that, even if it did decide to permit early withdrawal, the LPA did not preclude it from reversing that decision. This argument is not correct when applied to the specific facts of this case. If the Defendant had reversed its decision to grant early withdrawal or even discovered that an erroneous financial statement was sent out, it would have had to notify the Plaintiffs of the change or mistake by September 10 for the notification to have any effect. For on September 10, under the terms of the LPA, the Plaintiffs were to be paid at least 95% of their account balances. It wasn't until September 24, 2004 that the Defendant suspended withdrawal rights from Piranha. The Defendant did not send a "corrected August 31, 2004 financial statement" until early October. These attempts by the Defendant to reverse its decision permitting early withdrawal after the payment day arrived and passed without payment occurring are nullities.

Due to the time sensitive nature of the withdrawal process provided in the LPA, as of September 10, 2004 the Plaintiffs rightly believed that early withdrawal was permitted and that they would be paid their account balances that day. The correspondence that the Plaintiffs received as of September 10 expressly stated that their money was withdrawn from the Fund. Withdrawal in the month of August made the effective date of withdrawal August 31. Payment, to comply with the LPA, must then have been tendered no later than September 10. Piranha's failure to pay the Plaintiffs at least 95% of their capital accounts by September 10, 2004 was a material breach of the LPA.

*C. Subsequent cause to suspend withdrawals*

In connection with its earlier argument that September 30, 2004 was the correct effective date of withdrawal, the Defendant claims that on September 20, 2004 a legitimate reason for it to

10

suspend all withdrawals and redemptions arose. In light of the discussion *supra* in subsection A, this argument is moot. On September 10, 2004, the Defendant was required under the terms of the LPA to distribute the Plaintiffs' funds. The Defendant did not pay the Plaintiffs as of September 10 and thereby breached the LPA. Any arguments pointing to reasons to suspend withdrawals that occurred subsequent to Defendant's breach, including the NFA's September 20, 2004 commencement of action, are irrelevant.

## II. Damages

As a result of Defendant's material breach of the LPA, Plaintiffs are entitled to compensatory damages of $903,631.59. The court arrives at this value by subtracting the pro rata distributions made by Defendant to the Plaintiffs from the total of Plaintiffs' investment accounts as of August 31, 2004. The Plaintiffs are entitled to 100% of their withdrawal, rather than the minimum payment of 95% because the Fund's ending net asset value on August 31, 2004 was $30,150,848.54, a level more than adequate to fully compensate the withdrawing Plaintiffs.

The Defendant argues that it was concerned that many of the Limited Partners would withdraw at the same time and leave the Fund's assets at a level that would not allow for pay out to all withdrawing Partners. Such a concern is addressed by §6.3 of the LPA, which grants the General Partner the right to halt withdrawals if any one of a number events occur that place the Fund in jeopardy. The Defendant invoked §6.3 on September 24, 2004, ceasing all future withdrawals. But on September 10, §6.3 had not yet been invoked to prevent the Plaintiffs from being paid.

Plaintiffs contend that in addition to their capital fund balances, they are also entitled to prejudgment interest. In their briefs, the Plaintiffs and Defendant analyze the prejudgment

11

interest issue under the Illinois Interest Act, 815 ILCS 205/2. However, pursuant to Seventh Circuit and Illinois precedent, a party's entitlement to prejudgment interest should be interpreted under the same jurisdiction's laws that governed the interpretation of the contract in question. *See Am. Home Assurance Co. v. Dykema, Gossett, Spencer, Goodnow & Trigg*, 811 F.2d 1077, 1087-88 (7th Cir. 1987); *Gold v. Ziff Commc'ns Co.*, 322 Ill. App. 3d 32, 60, 748 N.E.2d 198, 254 Ill. Dec. 752 (1st Dist. 2001). We will therefore analyze the Plaintiffs' right to prejudgment interest pursuant to Delaware law.

According to Delaware law, prejudgment interest is available as a matter of right. *Trustees of Boston Univ. v. Ligand Pharms., Inc.*, No. 04-1358 (3d Cir. filed Jan. 19, 2006); *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (1992). When the underlying obligation to make payment arises out of a contract, the court should look to the contract to determine when interest begins to accrue. *Citadel Holding Corp.*, 603 A.2d at 826. Interest generally is to be awarded from the date payment was due. *Id.* The trial court has some discretion in fixing the amount of interest when an inordinate amount of delay was caused by one of the parties. *Id.* If a party's claim for damages is legal, rather than equitable, the appropriate rate of interest is found in 6 Del. C. §2301. *Am. Gen. Corp. v. Continental Airlines Corp.*, 622 A.2d 1, 14 (Del. C. 1992). §2301 provides, if "there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate." 6 Del. C. §2301(a) (2005).

In *Citadel Holding*, the plaintiff-appellee contended that he was entitled to be reimbursed for sums paid to defend against a lawsuit brought by defendant-appellant because the defendant breached an indemnification agreement. 603 A.2d at 819. The court agreed. *Id.* Plaintiff further argued that as a party awarded damages for breach of contract due to the opposing party's

12

unwarranted refusal of reimbursement, he was entitled to prejudgment interest as a matter of right. The defendant conceded that prejudgment interest is to be awarded as a matter of right and the court awarded interest from the date of payment demand. *Id.* at 826. The court deferred ruling on the rate of prejudgment interest and set the matter for prove up of plaintiff's expenses, which were to be fully reimbursed. *Id.* The plaintiff in *American General Corporation* sued for breach of contract, alleging the defendant breached a loan agreement and sought to recover prejudgment interest. 622 A.2d at 3. The court awarded prejudgment interest at the statutory rate of 5% over the Federal Reserve discount rate, measured from the date that the plaintiff's damages began to accrue. *Id.* at 13-14.

In this case, as in *Citadel Holding* and *American General*, prejudgment interest is necessary to fully compensate the Plaintiffs for their loss. The Plaintiffs lost the use of the money in their capital funds beginning on September 10, 2004 due to the Defendant's breach of contract and prejudgment interest will be assessed from that day forward. The appropriate interest rate to be applied to the Plaintiffs' damage award is the statutory rate of 5% over the Federal Reserve discount rate. Prejudgment interest damages are to be calculated by the parties according to the terms set forth above.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for summary judgment against Piranha Capital, L.P. is granted.

It is so ordered.

_____
Wayne R. Andersen
United States District Court

Dated: March 22, 2006